UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MATTHEW A. SOTO,

Plaintiff,

<u>**MEMORANDUM & ORDER**</u>

- against -                                         20-CV-2077 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiff Matthew A. Soto brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 13, 16.) For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Memorandum and Order.

**BACKGROUND**

**I.    Procedural History**

On May 19, 2016, Plaintiff filed an application for DIB, claiming that he had been disabled due to dextroscoliosis, degenerative disc disease, neuropathic arthropathy, depression, anxiety, and hypervigilance since December 31, 2011. (Administrative Transcript ("Tr."),[1] Dkt. 10, at 57–58.) The state agency denied his claim on August 26, 2016. (*Id.* at 57–68, 70–74.) After his claim was denied, Plaintiff requested and appeared for a hearing before an administrative law judge ("ALJ")

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

on November 16, 2018.  (*Id.* at 32–56.)  By decision dated January 14, 2019, ALJ James Kearns

found that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act")

from December 31, 2011, his alleged onset date, through December 31, 2016, the date last insured.

(*Id.* at 10–20.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision

on March 6, 2020.  (*Id.* at 1–5.)  Thereafter, Plaintiff timely commenced this action.[2]

## II.    The ALJ's Decision

### A.    The Five-Step Inquiry

In evaluating disability claims, the ALJ must conduct a five-step inquiry.  The plaintiff

bears the burden of proof at the first four steps of the inquiry, and the Commissioner bears the

burden at the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).

First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful

activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the answer is yes, the plaintiff is not disabled.  *Id.*

If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff

suffers from a severe impairment.  *Id.* § 404.1520(a)(4)(ii).  An impairment is severe when it

---

[2] Under Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party . . . may obtain a review of such
> decision by a civil action commenced within sixty days after the mailing to him of
> notice of such decision or within such further time as the Commissioner of Social
> Security may allow.

42 U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is
presumed received five days after it is dated unless the claimant makes a reasonable showing to
the contrary."  *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at
*3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).  Applying this standard,
the Court determines that Plaintiff received the Commissioner's final decision on March 11, 2020
(*i.e.*, five days after Plaintiff's request to appeal the ALJ's decision was denied on March 6, 2020)
and that Plaintiff's filing of the instant action on May 6, 2020—56 days later—was timely.  (*See
generally* Complaint, Dkt. 1.)

"significantly limit[s] [the plaintiff's] physical or mental ability to do basic work activities." *Id.* § 404.1522(a). If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled. *Id.* § 404.1520(a)(4)(ii).

If the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1. If the ALJ determines at step three that the plaintiff has one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act. *Id.* § 404.1520(a)(4)(iii).

If the plaintiff does not have a listed impairment, the ALJ must determine the plaintiff's residual functional capacity ("RFC")[3] before continuing to steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* § 404.1545(a)(1). The ALJ is responsible for assessing the plaintiff's RFC "based on all the relevant evidence in the case record." *Pellot v. Comm'r of Soc. Sec.*, No. 18-CV-3337 (AMD), 2019 WL 3500919, at *1 (E.D.N.Y. July 31, 2019) (citation omitted). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work.

---

[3] "[A]n individual's RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (citation and quotations omitted). "[A] claimant is not disabled if her 'residual functional capacity and vocational abilities make it possible for her to do work which exists in the national economy, but she remains unemployed because of her inability to get work,' or because of 'the hiring practices of employers,' or because the claimant 'would not actually be hired to do work she could otherwise do.'" *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (alterations omitted) (quoting 20 C.F.R. § 416.966(c)(1), (3), (7)).

*Id.* § 404.1520(a)(4)(iv).  If the answer is yes, the plaintiff is not disabled.  *Id.*  If the plaintiff

cannot, or if no past relevant work exists, the ALJ will proceed to step five and determine whether

the plaintiff, given his or her RFC, age, education, and work experience, has the capacity to

perform other substantial gainful work in the national economy.  *Id.* § 404.1520(a)(4)(v).  If the

answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to

benefits.  *Id.*

**B.      The ALJ's Decision**

Here, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity "during the period from his alleged onset date of December 31, 2011 through his date last

insured of December 21, 2016."  (Tr. at 12.)  At step two, the ALJ determined that Plaintiff had

the following severe impairments: morbid obesity, degenerative disc disease, depression, post-

traumatic stress disorder, and anxiety.  (*Id.* at 13.)  The ALJ noted that these impairments

"significantly limit [Plaintiff's] ability to perform basic work activities."  (*Id.*)  At step three, the

ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed

impairments in the Listings.  (*Id.*)  At step four, the ALJ determined that Plaintiff "has no past

relevant work."  (*Id.* at 19.)

But with respect to Plaintiff's RFC, the ALJ found that Plaintiff "had the residual functional

capacity to perform sedentary work as defined in [20 C.F.R. § 404.1567(a)] except [that he]

requires an option to stand and shift positions while remaining on task; is limited to simple and

routine tasks with only occasional interaction with coworkers and the public."  (*Id.* at 15.)

Although the ALJ "[found] that [Plaintiff's] medically determinable impairments could reasonably

be expected to cause the alleged symptoms," the ALJ concluded that Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely

consistent with the medical evidence and other evidence in the record." (*Id.* at 16.)  First, the ALJ

discussed Plaintiff's testimony:

> [Plaintiff's] statements about the intensity, persistence, and limiting effects of his symptoms . . . are inconsistent based on his inconsistent reports, activities of daily living, and overall medical evidence, which do not support the level of severity alleged. [Plaintiff] testified that he regularly plays video games from five (5) to eight (8) hours a day, which requires a high level of attention and concentration, as well as sitting or alternate sitting/standing.  He also testified that he went to Dallas, Texas for a week in 2016 to meet other [video game players] whom he met online, suggesting a mild limitation in social interacting from the ability to meet people on the internet; and treatment records show that he reported having a good time in Dallas with his friend.  He further testified that he occasionally lifts and carries his 19-pound daughter for approximately 10 minutes; and reported to the consultative examiner activities of daily living, including grooming himself regularly, shopping at nearby stores, managing his own finances, and, although not preferred, that he has the ability to go out alone.  He further reported that on good days he is able to play with his children, play videogames, read books and watch t.v.

(*Id.* at 16–17 (citations omitted).)

> Second, the ALJ recounted the clinical findings:

> Clinical findings from 2011, 2012, 2013, 2014, and 2016 include a lower extremity venous Doppler showing[4] no evidence of thrombosis; lower extremity arterial Doppler duplex ultrasound showing no significant flow-limiting stenosis or evidence of occlusion within the visualized arterial system of the bilateral lower extremities; normal upper extremity arterial duplex Doppler study; NVC/EMG showing mild L4-L5 radiculopathy; and aorta Doppler showing normal aorta. Moreover, the record shows no evidence of MRIs or x-rays of the cervical or lumbar spines.

> Examination notes from 2018 by treating source Nabil Rezk, M.D. indicate that [Plaintiff] demonstrates normal gait, normal station, normal muscle tone; and normal psychomotor activity, unimpaired perception, good attention and concentration, unimpaired memory, and good insight and judgment. Progress notes show consistent reports by [Plaintiff] that he is doing well, has stable mood, normal appetite, normal concentration, and no side effects from medications, but sad mood and loss of pleasure. Moreover, despite reports of sadness, the claimant declined

---

[4] According to the U.S. National Library of Medicine, a "Doppler Ultrasound" is "an imaging test that uses sound waves to show blood moving through blood vessels."  MedlinePlus: Doppler Ultrasound, U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/lab-tests/doppler-ultrasound/ (last visited Aug. 20, 2021).

changes to his medication or to add antipsychotics to augment the action of Lexapro, which seems to support his reports that his mood is stable.

(*Id.* at 17 (citations omitted).)

Third, the ALJ discussed the opinions of medical providers:

As for the opinion evidence, Sudharam Idupuganti, M.D. opined on April 17, 2017 that [Plaintiff] is severely limited in his ability to function in a job and ordinary social situations; and on September 21, 2016 provided that [Plaintiff] has marked limitation in understanding, remembering and applying information, moderate to marked in concentration, persistence and pace, marked limitation in social interaction, and moderate limitation in adaption. These opinions are given little weight as it is generally inconsistent with and more restrictive than the overall treatment record, as well as [Plaintiff's] own reports, reflecting overall normal mental status.

Mildred Antonelli, Ph.D. opined on November 17, 2017 that [Plaintiff] has marked limitations in his ability to function and that he is permanently disabled. This opinion is given little weight as it is inconsistent with the overall record and [Plaintiff's] reported activities of daily living, which reflect less restrictive limitations. Moreover, the therapist's statement indicating [Plaintiff] is "permanently disabled" is not a medical opinion, but rather an administrative finding dispositive of a case, which is an issue reserved to the Commissioner, and as such is not entitled to any special significant weight.

[Plaintiff] was also assessed a GAF score of 60, but I give this score little weight as they are highly subjective ratings that can easily vary from one practitioner to the next and generally represent only a "snapshot" of the presentation of information available from a subject on the day of assessment.

Consultative examiner Ashley Dolan, Psy.D. opined on August 4, 2016 that [Plaintiff] is able to follow and understand simple directions, perform simple tasks independently, and maintain attention and concentration; has mild limitations maintaining a regular schedule; is able to learn new tasks perform complex tasks independently, make appropriate decisions, and relate adequately with others; has mild limitations appropriately dealing with stress; and that his difficulties are caused by psychiatric symptoms but in itself do not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis. This opinion is given great weight as it is supported by a detailed examination and is generally consistent with the record, including updated treatment notes from 2018. However, the specific limitations were not adopted giving the benefit of the doubt to [Plaintiff's] allegation of depression and anxiety being around others, adequate accommodations have been made limiting [Plaintiff] to simple routine tasks and occasional interaction with coworkers and the public.

6

Consultative examiner Chaim Shtock, D.O. opined on August 4, 2016 that [Plaintiff] has mild limitations for heavy lifting and squatting; mild to moderate limitations with kneeling and mild limitations with crouching; mild to moderate limitations with frequent stair climbing, walking long distances, standing long periods, and sitting long periods; moderate to marked limitations with frequent bending; no limitations performing overhead activities using both arms, and no limitations using both hands for fine and gross manual activities. This opinion is given great weight as it is consistent with the overall medical record and [Plaintiff's] reports of his functional abilities.

Isaac J. Kreizman, M.D. opined that [Plaintiff] is permanently disabled. This opinion is given little weight as it is internally inconsistent with reports that [Plaintiff] experienced improvement and relief with steroid injections and combination of Roxicodone and Soma, as well as inconsistent with physical examination findings showing normal coordination, muscle strength at 5/5, full range of motion of the bilateral upper extremities, and 4/5 strength of the bilateral lower extremities, and ability to ambulate effectively without an assistive device. Moreover, the doctor's statement indicating [Plaintiff] is "permanently disabled," is not a medical opinion, but rather an administrative finding dispositive of a case, which are issues reserved to the Commissioner, and as such are not entitled to any special significant weight.

Dr. Kreizman also provided that [Plaintff] can sit/stand/walk for three (3) hours in an 8-hour workday, should avoid continuous sitting, and can frequently lift/carry up to 10 pounds frequently and 20 pounds occasionally, requires unscheduled breaks, and will likely miss two (2) to three (3) days per month, can use standard public transportation, climb few stairs with one hand rail, is able to ambulate effectively, and does not need assistive devices to ambulate effectively. Partial weight is given to the lifting and carrying limitation as it is consistent with [Plaintiff's] testimony that he occasionally carries his 19-pound daughter, but little weight is given to the portion of the opinion regarding absences as it is conclusory and inconsistent with the overall medical record, which shows no evidence of frequent hospital visits or mental instability; and little weight is given to the sit/stand/walk limitations as the claimant was able to go on a long flight to Texas, and testified to playing video games for five (5) to six (6) hours, albeit with breaks. Accordingly, adequate accommodations have been made for a sit/stand option in the residual functional capacity determined herein.

I have also considered but gave little probative weight to K. Gawley, Ph.D. whose residual functional capacity opinion of record dated August 26, 2016 reflects mild to moderate limitations as the opinion was based on outdated paragraph B criteria.

In sum, the above residual functional capacity assessment is supported by the lack of clinical findings showing more than mild lumbar radiculopathy, [Plaintiff's] own reports of effective management with conservative treatment, physical

examinations showing a trend of improvement, and overall unremarkable mental and physical status examinations.

(*Id.* at 17–19 (citations omitted).)

The ALJ concluded that, given Plaintiff's "age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed." (*Id.* at 19.) The ALJ concluded, therefore, that Plaintiff was not disabled during the claimed period of disability. (*Id.* at 20.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (citation omitted). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (brackets omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (citation omitted). But courts must "defer to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam).

## DISCUSSION

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence and suffers from the following legal errors: (1) the ALJ failed to properly weigh the medical opinion evidence in accordance with the treating physician rule; and (2) the ALJ failed to properly evaluate Plaintiff's subjective statements.   (Plaintiff's Motion for Judgment on the Pleadings ("Pl. Br."), Dkt. 14, at 20, 31.)  For the reasons below, the Court grants Plaintiff's motion and remands for the ALJ to reconsider the evidence in assessing RFC or further explain his rationale.  *See Fontanez v. Colvin*, No. 16-CV-1300 (PKC), 2017 WL 4334127, at *13 (E.D.N.Y. Sept. 28, 2017) ("In addition to its authority to affirm, modify, or reverse a final decision, the Court may remand the case for the ALJ to further develop the record, resolve conflicts and ambiguities, or elucidate his or her rationale.").

## I.    The ALJ Failed to Properly Weigh the Medical Opinion Evidence in Finding Plaintiff's RFC

Plaintiff argues that the ALJ failed to properly weigh the opinions of Plaintiff's treating physician and treating psychiatrist in evaluating Plaintiff's RFC.  The Court agrees.

### A.    Treating Physician Rule[5]

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion."  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  "First, the ALJ must decide whether the opinion is entitled to controlling weight."  *Id.*  "The opinion of a claimant's treating physician . . . is given controlling weight so long as it is well-supported by

---

[5] The treating physician rule applies to claims filed before March 27, 2017, which includes Plaintiff's claim here.  *See* 20 C.F.R. §§ 404.1527, 416.927 (2017); *see also Herr o/b/o Greis v. Comm'r of Soc. Sec.*, No. 19-CV-815S (WMS), 2020 WL 2468415, at *3 (W.D.N.Y. May 13, 2020).

medically acceptable clinical and laboratory diagnostic techniques and is [consistent] with the other substantial evidence in the case record." *Id.* (citation, quotations, and brackets omitted); *see also* 20 C.F.R. § 404.1527(c)(2).

"Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. "In doing so, it must explicitly consider" (1) "the frequency, length, nature, and extent of treatment"; (2) "the amount of medical evidence supporting the opinion"; (3) "the consistency of the opinion with the remaining medical evidence"; and (4) "whether the physician is a specialist." *Id.* at 95–96 (citations, quotations, and brackets omitted); *see also* 20 C.F.R. § 404.1527(c)(2)–(6). "An ALJ's failure to 'explicitly' apply the [four] factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citation omitted). In such cases, a court must remand unless the ALJ has "provided good reasons for its weight assignment," *id.* (citation, quotations, and brackets omitted), or unless "a searching review of the record assures [the court] that the substance of the treating physician rule was not traversed," *id.* (citation and quotations omitted). Thus, "[a]t both steps, the ALJ must give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." *Id.* (citations, quotations, and brackets omitted); *see also* 20 C.F.R. § 404.1527(c)(2). Courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam).

In contrast to their review of opinions from treating physicians, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. And "[w]here . . . there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Sanders v.*

*Comm'r of Soc. Sec.*, 506 F. App'x 74, 78 n.4 (2d Cir. 2012) (summary order) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).

### B.    The ALJ Failed to Adequately Apply the Treating Physician Rule

The ALJ found that Plaintiff has the RFC "to perform sedentary work . . . except [that he] requires an option to stand and shift positions while remaining on task [and] is limited to simple and routine tasks with only occasional interaction with coworkers and the public." (Tr., Dkt. 10, at 15.)  Plaintiff first argues the ALJ gave insufficient weight to the opinion of Dr. Kreizman, Plaintiff's treating physician, and gave too much weight to the opinion of Dr. Shtock, a consulting examiner.  Plaintiff next argues that the ALJ gave insufficient weight to the opinion of Dr. Idupuganti, Plaintiff's treating psychiatrist, and to the opinion of Dr. Antonelli, an examining psychiatrist.

1.    The ALJ Failed to Provide Good Reasons for Discounting the Opinion of Plaintiff's Treating Physician

Plaintiff contends that the ALJ erred in assessing the testimony of his treating physician, Dr. Kreizman.  Dr. Kreizman treated Plaintiff regularly from late 2011 through 2017.  (*See id.* at 333–582.)

In making the RFC determination, the ALJ gave "little weight" to Dr. Kreizman's opinion that Plaintiff "is permanently disabled," reasoning that this opinion was "internally inconsistent with reports that [Plaintiff] experienced improvement and relief with steroid injections and combination of Roxicodone and Soma," as well as with "physical examination findings showing normal coordination, muscle strength at 5/5, full range of motion of the bilateral upper extremities, and 4/5 strength of the bilateral lower extremities, and ability to ambulate effectively without an assistive device."  (*Id.* at 18.)  The ALJ also gave "little weight" to Dr. Kreizman's opinion that Plaintiff "can sit/stand/walk for three (3) hours in an 8-hour workday [and] should avoid

continuous sitting," reasoning that Plaintiff "was able to go on a long flight to Texas, and testified to playing video games for five (5) to six (6) hours, albeit with breaks." (*Id.*)  Further, the ALJ gave "little weight" to Dr. Kreizman's opinion that Plaintiff "requires unscheduled breaks, and will likely miss two (2) to three (3) days per month," explaining that this "portion of the opinion regarding absences [was] conclusory and inconsistent with the overall medical record, which shows no evidence of frequent hospital visits or mental instability." (*Id.*)  Finally, the ALJ gave "partial weight" to Dr. Kreizman's opinion that Plaintiff "can frequently lift/carry up to 10 pounds frequently and 20 pounds occasionally," as it was "consistent with [Plaintiff's] testimony that he occasionally carries his 19-pound daughter." (*Id.*)

Although the ALJ addressed "the consistency of [Dr. Kreiman's] opinion[s] with the remaining medical evidence," *Estrella*, 925 F.3d at 96, he failed to explicitly consider "the frequency, length, nature, and extent of treatment" or "whether [Dr. Kreizman] is a specialist," *id.* at 95–96 (citations, quotations, and brackets omitted).  This was a procedural error.  *See, e.g.*, *Brady v. Colvin*, No. 14-CV-5773 (ADS), 2016 WL 1448644, at *11 (E.D.N.Y. Apr. 12, 2016) (remanding for failure to apply the treating physician rule in part because the ALJ "did not consider the amount of time [the treating physician] saw the [p]laintiff . . . [or] consider [the treating physician's] status as a specialist in evaluating his opinion"); *Martin v. Berryhill*, No. 17-CV-8640 (VSB) (SN), 2019 WL 1756434, at *4 (S.D.N.Y. Feb. 20, 2019) (remanding because, among other things, "the ALJ failed to discuss the nature and extent of [the treating physician's] treatment relationship with [the] [p]laintiff"), *report and recommendation adopted*, No. 17-CV-8640 (VSB) (SN), 2019 WL 1755425 (S.D.N.Y. Apr. 19, 2019).

"Because the ALJ procedurally erred, the question becomes whether a searching review of the record assures [the Court] that the substance of the [treating physician] rule was not traversed—

*i.e.*, whether the record otherwise provides good reasons for assigning 'little weight' to Dr. [Kreizman's] opinion." *Estrella*, 925 F.3d at 96 (citation, quotations, and alterations omitted). Plaintiff argues that the ALJ erred by finding material inconsistencies between Dr. Kreizman's opinion and the other evidence. First, Plaintiff contends that the ALJ "erred by discounting Dr. Kreizman's opinions because [Plaintiff] has been able to engage in some activities of daily living, including playing video games and taking a trip to Texas." (Pl. Br., Dkt. 14, at 22.) As noted, the ALJ gave "little weight" to Dr. Kreizman's opinion that Plaintiff "can sit/stand/walk for three (3) hours in an 8-hour workday [and] should avoid continuous sitting," reasoning that Plaintiff "was able to go on a long flight to Texas, and testified to playing video games for five (5) to six (6) hours, albeit with breaks." (Tr., Dkt. 10, at 18.)

This was not a "good reason[] for assigning 'little weight' to Dr. [Kreizman's] opinion." *Estrella*, 925 F.3d at 96 (citation and quotations omitted). That Plaintiff "was able" to fly to Texas once does not undermine Dr. Kreizman's conclusion that Plaintiff cannot sit for more than three hours "in a competitive environment on a sustained and ongoing basis . . . 5 days per week." (Tr., Dkt. 10, at 286.)[6] Nor does Plaintiff's testimony that he plays video games for "five hours" or "eight hours" some days conflict with Dr. Kreizman's opinions, given that Plaintiff clarified that he "normally [can sit for only] ten minutes or so" (*id.* at 43), takes breaks when necessary (*id.* at 45), and that "five to eight hours" would be "a long day" (*id.*). Rather, this testimony is consistent with Dr. Kreizman's opinion that "it is medically necessary for [Plaintiff] to avoid continuous sitting in an 8-hour workday" and "take unscheduled breaks to rest at unpredictable intervals." (*Id.* at 287–88.)

---

[6] There also is no evidence the airline prohibited Plaintiff from standing periodically during the flight.

Defendant argues that Dr. Kreizman's "opined limitations were also inconsistent with Plaintiff's other daily activities, such as regularly shopping at stores, attending parent-teacher conferences, volunteering at a rescue shelter, moving apartments, fulfilling jury duty, and independently caring for and playing with his young children (one of whom was an eight month-old baby with a post-surgical cardiac condition)."   (Defendant's Cross-Motion and Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Br."), Dkt. 16-1, at 17.)  But even if the ALJ had relied on this evidence, it did not provide a "good reason[] for assigning 'little weight' to Dr. [Kreizman's] opinion."  *Estrella*, 925 F.3d at 96 (citation and quotations omitted).  Although such evidence *may* be inconsistent with a finding of disability in certain cases,[7] "it is well-settled law in this Circuit that such activity does not, in itself, contradict a claim of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Iorio v. Comm'r of Soc. Sec.*, No. 18-CV-5898 (PKC), 2020 WL 1536406, at *7 (E.D.N.Y. Mar. 30, 2020) (citations and quotations omitted).[8]  Plaintiff's ability to carry out such tasks thus was an insufficient explanation for rejecting Dr. Kreizman's opinion.

---

[7] *See Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 25 (2d Cir. 2019) (summary order) ("[The plaintiff] was able to do household chores, walk over a mile, do stretching exercises, lift small weights, and sit as a passenger for a car trip between New York and Virginia. Thus, [his] own testimonial evidence was consistent with the ALJ's RFC finding that he could perform sedentary work with some limitations." (citation omitted)); *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (summary order) (recognizing that a claimant's participation in daily activities that exceed the alleged limitations can support a finding of non-disability).

[8] *See also Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) ("[I]t is not reasonable to infer from [the] plaintiff's statement that he can 'walk ten blocks, travel for two to three hours, and do his housework' that he can sit attentively for six hours out of eight, while standing for the other two, with only minimal breaks. These are different activities requiring different capabilities." (brackets omitted)); *Citro v. Colvin*, No. 16-CV-6564 (BCM), 2018 WL 1582443, at *14 (S.D.N.Y. Mar. 28, 2018) ("[The] plaintiff also testified that he helped his cousin with cleaning and shopping and took public transportation. A short trip to the grocery store, however, is quite different from sitting or standing for six hours during an eight-hour workday."); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("[T]he ALJ compounded his error

Second, Plaintiff contends that the ALJ erred by giving "great weight" to Dr. Shtock's opinion

> that [Plaintiff] has mild limitations for heavy lifting and squatting; mild to moderate limitations with kneeling and mild limitations with crouching; mild to moderate limitations with frequent stair climbing, walking long distances, standing long periods, and sitting long periods; moderate to marked limitations with frequent bending; no limitations performing overhead activities using both arms, and no limitations using both hands for fine and gross manual activities.

(Tr., Dkt. 10, at 18.)  The ALJ reasoned that this opinion was "consistent with the overall medical record and [Plaintiff's] reports of his functional abilities."  (*Id.*)

But the ALJ failed to specify what aspects of the "overall medical record" were consistent with this opinion, especially considering that the ALJ apparently found the opinion inconsistent with the report of Plaintiff's treating physician, Dr. Kreizman.  And if Dr. Shtock's conclusion represents such a "conflicting opinion[] between the treating and consulting sources," it "should be given limited weight."  *Sanders*, 506 F. App'x at 78 n.4 (quoting *Cruz*, 912 F.2d at 13).

Further, to the extent Dr. Shtock's opinion is "consistent with" Plaintiff's "reports of his functional abilities" (Tr., Dkt. 10, at 18), it does not suggest Plaintiff has the RFC to perform sedentary work.   For example, Plaintiff testified that he can "normally" sit for only "ten minutes or so" (*id.* at 43), walk an average of "two to five blocks" in Brooklyn, New York (*id.*), hold his 19-pound daughter for "five to ten minutes" while sitting (*id.*), and stand for "about ten minutes" before "seesawing" (*id.* at 44).  He also testified that "stairs [are] an obstacle" (*id.* at 48), he has limited ability to "bend over at the waist to pick something up off of the floor" although he can occasionally pick up a gallon of milk "[i]f [he] ha[s] to" (*id.* at 49), and he can sweep the floor but would have to "stop most of the time at one room if [he is] lucky" (*id.* at 50).  To the extent

---

when he concluded that [the plaintiff] could perform sedentary work because she testified that she cooked and shopped for herself, and used public transportation.").

Plaintiff's "reports of his functional abilities" were "consistent" with Dr. Shtock's findings of "mild" and "moderate" limitations, therefore (*id.* at 18), the ALJ did not reasonably infer from this evidence that Plaintiff has the RFC to perform sedentary work with only "an option to stand and shift positions while remaining on task" (*id.* at 15). *Cf. Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) ("[I]t is not reasonable to infer from [the] plaintiff's statement that he can 'walk ten blocks, travel for two to three hours, and do his housework' that he can sit attentively for six hours out of eight, while standing for the other two, with only minimal breaks. These are different activities requiring different capabilities." (brackets omitted)).

Finally, the ALJ noted that

[c]linical findings from 2011, 2012, 2013, 2014, and 2016 include a lower extremity venous Doppler showing no evidence of thrombosis; lower extremity arterial Doppler duplex ultrasound showing no significant flow-limiting stenosis or evidence of occlusion within the visualized arterial system of the bilateral lower extremities; normal upper extremity arterial duplex Doppler study; NVC/EMG showing mild L4-L5 radiculopathy; and aorta Doppler showing normal aorta. Moreover, the record shows no evidence of MRIs or x-rays of the cervical or lumbar spines.

(Tr., Dkt. 10, at 17.)

But the ALJ did not explain how these findings affected his view of Dr. Kreizman's conclusions.  Further, the "clinical findings" the ALJ referenced "simply document[] objective findings without interpreting their practical implications," suggesting that "the ALJ's conclusion rests improperly on his lay assessment of the medical evidence."  *Smith v. Comm'r of Soc. Sec.*, No. 15-CV-1473 (JCF), 2016 WL 1388063, at *11 (S.D.N.Y. Mar. 23, 2016); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) ("The ALJ is not permitted to substitute his

16

own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.").[9]

Because the ALJ did not explicitly consider all the requisite factors when ascribing "little weight" to the opinion of Plaintiff's treating physician, the question becomes whether "a searching review of the record . . . assures [the Court] that . . . the record otherwise provides good reasons for assigning 'little weight' to Dr. [Kreizman's] opinion." *Estrella*, 925 F.3d at 96 (citation, quotations, and brackets omitted). After reviewing the record, the Court cannot find that the ALJ had "good reasons" to discount Dr. Kreizman's opinion in favor of Dr. Shtock's.

2.   The ALJ Failed to Provide Good Reasons for Discounting the Opinion of Plaintiff's Treating Psychiatrist

Plaintiff next argues that the ALJ "mischaracterizes the record by concluding that the opinions from treating psychiatrist Dr. Idupuganti are inconsistent with mental status exam findings." (Pl. Br., Dkt. 14, at 26.) Dr. Idupuganti treated Plaintiff regularly from 2013 through 2017. (*See* Tr., Dkt. 10, at 279–83, 290–312.) As noted, the ALJ gave "little weight" to Dr. Idupuganti's opinion "that [Plaintiff] is severely limited in his ability to function in a job and ordinary social situations" and "has marked limitation in understanding, remembering and applying information, moderate to marked in concentration, persistence and pace, marked

---

[9] Plaintiff also contends that the ALJ erred by giving "little weight" to Dr. Kreizman's opinion that Plaintiff "will likely miss two (2) to three (3) days per month," which the ALJ explained was "conclusory and inconsistent with the overall medical record, which shows no evidence of frequent hospital visits or mental instability." (Tr., Dkt. 10, at 18; *see also* Pl. Br., Dkt. 14, at 22.) Plaintiff argues that although "[t]here is nothing in the record suggesting Plaintiff has a condition that would normally require frequent hospital visits, . . . there is no requirement in the Social Security Act nor the Commissioner's Regulations that an individual must be treated in a hospital setting to be found disabled." (Pl. Br., Dkt. 14, at 22.)

But Plaintiff's argument misconstrues the ALJ's findings. The ALJ did not say that the infrequency of hospital visits undermines a disability claim, generally. He merely found that the record belied *Dr. Kreizman's opinion* that Plaintiff would miss work for frequent hospital visits.

limitation in social interaction, and moderate limitation in adaption." (*Id.* at 17.)  Dr. Idupuganti

also reported on April 17, 2017 that

> [Plaintiff] is . . . unable to engage in gainful employment due to the intensity of his
> physical and psychological symptoms. He spends most of his time in bed, sleeps
> excessively and has no friends or social activities. He gets along poorly with his
> wife. His ability to relate appropriately with others is impaired due to his depression
> and irritability. This inability began in 2011 and has not significantly improved with
> therapy and medications.

(*Id.* at 291.)  The ALJ found these conclusions "generally inconsistent with and more restrictive

than the overall treatment record, as well as [Plaintiff's] own reports, reflecting overall normal

mental status." (*Id.* at 17.)

Again, the ALJ failed to "explicitly consider . . . the frequency, length, nature, and extent

of treatment; . . . the amount of medical evidence supporting the opinion; . . . [and] whether [Dr.

Idupuganti] is a specialist."  *Estrella*, 925 F.3d at 95–96 (citations, quotations, and brackets

omitted).  Because this is procedural error, *see, e.g.*, *Brady*, 2016 WL 1448644, at *11; *Martin*,

2019 WL 1756434, at *4, "the question becomes whether a searching review of the record assures

[the Court] that . . . the record otherwise provides good reasons for assigning 'little weight' to Dr.

[Idupuganti's] opinion," *Estrella*, 925 F.3d at 96 (citation, quotations, and alterations omitted).

The Court finds that it does not.

First, the ALJ did not explain how Dr. Idupuganti's conclusions were inconsistent with the

treatment record.  Nor did he specify which medical records he believed conflicted with Dr.

Idupuganti's opinion.  He therefore failed to provide "good reason" for discounting that opinion.

*See, e.g.*, *Crutch v. Colvin*, No. 14-CV-3201 (SLT), 2017 WL 3086606, at *8 (E.D.N.Y. July 19,

2017) ("Without specific citations to the medical record identifying specific portions that are

inconsistent, the Court cannot properly review the ALJ's decision, and claimants are deprived of

an adequate understanding of the reasoning behind the disposition of their cases."); *Brown v.*

*Comm'r of Soc. Sec.*, No. 18-CV-1994 (RRM), 2020 WL 2836758, at *13 (E.D.N.Y. May 28, 2020) (finding that the ALJ failed to provide "good reasons" for giving "little weight" to a treating physician's opinion because "[a]lthough the ALJ deemed the doctor's assessment of [the plaintiff's] limitations 'grossly disproportionate to any clinical findings and objective diagnostic testing,' he did not specify the clinical findings and diagnostic tests" (record citation omitted)).[10]

Second, many of Plaintiff's treatment records seem to support Dr. Idupuganti's conclusions. As Plaintiff points out, Dr. Idupuganti based his opinion on findings that Plaintiff experienced depressed mood, persistent or generalized anxiety, labile affect, feelings of guilt or worthlessness, hostility or irritability, difficulty thinking or concentrating, easy distractibility, poor recent memory, persistent irrational fears, recurrent panic attacks, vigilance and scanning, anhedonia/pervasive loss of interests, appetite disturbances/weight change, decreased energy, impulsive or damaging behavior, intense and unstable interpersonal relationships, pathological dependence, passivity, or aggressiveness, psychomotor agitation, social withdrawal or isolation, and excessive sleep. (Tr., Dkt. 10, at 280.) Plaintiff's treatment notes further reflect depression

---

[10] The ALJ noted that Dr. Nabil Rezk, another of Plaintiff's treating psychiatrists, made "progress notes" showing that Plaintiff was "doing well, ha[d] stable mood, normal appetite, normal concentration, and no side effects from medications," despite "sad mood and loss of pleasure." (Tr., Dkt. 10, at 17.) But Dr. Rezk also reported that Plaintiff suffers from depression resulting in "sadness, dysphoria, agitation, poor concentration[,] and unresolved feelings of grief which impair his daily functioning," as well as anxiety resulting in "preoccupation, worry, poor concentration, and unresolved feelings which impair daily functioning." (*Id.* at 603.) The ALJ did not attempt to reconcile these notes with his decision to give "little weight" to Dr. Idupuganti's opinion. *See Martin v. Colvin*, No. 13-CV-2827 (VSB) (RLE), 2014 WL 4467709, at *15 (S.D.N.Y. Sept. 10, 2014) (finding no "good reason" to reject the opinion of a treating physician because "[a]lthough an ALJ need not reconcile every piece of conflicting evidence, the ALJ . . . broadly characterized [the treating physician's] medical records without discussing the evidence of [the plaintiff's] chronic pain" (citation omitted)); *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004) ("It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim." (citing *Lopez v. Sec'y of Dept. of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984), *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975), and *Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968))).

(*id.* at 294, 295, 297, 304, 310, 597); anxiety (*id.* at 297, 301, 302, 310, 311), a "constricted" affect (*id.* at ECF 606, 609, 612, 615, 618, 621, 624, 627, 630, 633, 636), irritability (*id.* at ECF 301, 305, 307), and hypervigilance (*id.* at 312).

And Dr. Idupuganti's conclusions were consistent with those of consulting examiner Dr. Mildred Antonelli.  Dr. Antonelli diagnosed Plaintiff with Major Depression, Severe Anxiety, and Post-Traumatic Stress Disorder, and opined that Plaintiff "cannot be around people" and "would disrupt any environment in which he might find himself." (*Id.* at 588–89.)  Although the ALJ gave Dr. Antonelli's conclusions "little weight," they tend to belie the ALJ's conclusion that Dr. Idupuganti's opinion, as the treating psychiatrist, was "generally inconsistent with and more restrictive than the overall treatment record." (*Id.* at 17.)

Defendant argues that "Dr. Idupuganti almost never documented any objective mental status findings," but relied "largely [on] Plaintiff's own subjective reports." (Def. Br., Dkt. 16-1, at 20.)  This, Defendant contends, "is not enough" under 20 C.F.R. § 404.1521, which requires "medically acceptable clinical and laboratory diagnostic techniques." (*Id.* (quoting 20 C.F.R. § 404.1521).)  But "[m]edically acceptable clinical and laboratory diagnostic techniques include consideration of a 'patient's report of complaints, or history, as an essential diagnostic tool.'" *Capers v. Comm'r of Soc. Sec.*, No. 18-CV-4579 (KAM), 2020 WL 4260996, at *7 (E.D.N.Y. July 24, 2020) (brackets omitted) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).  Thus, a doctor's "reli[ance] on [a patient's] subjective complaints hardly undermines his opinion as to her functional limitations." *Green-Younger*, 335 F.3d at 107 (citation omitted).  Dr. Idupuganti's reliance on Plaintiff's subjective complaints therefore was not a "good reason" for the ALJ to discount the doctor's opinion.

Defendant also argues that "Plaintiff's treatment consisted entirely of monthly medication management visits with few, and only minor, adjustments in prescribed medications," and Plaintiff [n]ever required emergency intervention for psychiatric decompensation or crisis stabilization." (Def. Br., Dkt. 16-1, at 20–21.)  Rather, Defendant points out, Plaintiff "cared for young children, attended parent-teacher conferences, managed finances, volunteered at a rescue shelter, moved apartments, spent time with his family, researched a move out of state, shopped for groceries, fulfilled jury duty, pursued disability benefits, watched television, vacationed in Dallas with friends, and . . . played video games 'up to 8 hours daily.'"  (*Id.* at 21.)  But, as noted, "[t]hese are different activities requiring different capabilities," and "it is not reasonable to infer . . . that [Plaintiff] can sit attentively for six hours out of eight, while standing for the other two, with only minimal breaks."  *Dambrowski*, 590 F. Supp. 2d at 583 (brackets omitted).

Finally, Defendant argues that the opinion of consulting psychologist, Dr. Ashley Dolan, "also contradicted Dr. Idupuganti's assessment."  (Def. Br., Dkt. 16-1, at 21.)  The ALJ gave "great weight" to Dr. Dolan's conclusions that Plaintiff

> is able to follow and understand simple directions, perform simple tasks independently, and maintain attention and concentration; has mild limitations maintaining a regular schedule; is able to learn new tasks, perform complex tasks independently, make appropriate decisions, and relate adequately with others; has mild limitations appropriately dealing with stress; and that his difficulties are caused by psychiatric symptoms but in itself do not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis.

(Tr., Dkt. 10, at 18.)  But Dr. Dolan was a consulting psychologist who examined Plaintiff only once.  As the Second Circuit has "frequently cautioned," *Estrella*, 925 F.3d at 98 (quotations omitted), "ALJs should not rely heavily on the findings of consultative physicians after a single examination," *id.* (quoting *Selian*, 708 F.3d at 419).  "This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."  *Id.*  "That means that the opinion of a psychiatrist

with a solid longitudinal relationship with a patient, unless it is fundamentally flawed, is likely to have much more probative value than that of a single-examination consultant." *Vicino v. Berryhill*, No. 17-CV-4485 (BMC), 2018 WL 2103203, at *5 (E.D.N.Y. May 7, 2018). The ALJ failed to provide an adequate basis to credit Dr. Dolan's conclusion after a single examination that Plaintiff's "difficulties . . . do not appear to be significant enough to interfere with [his] ability to function on a daily basis" (Tr., Dkt. 10, at 18) *over* Dr. Idupuganti's conclusion after years of treatment that "[Plaintiff] is . . . unable to engage in gainful employment due to the intensity of his physical and psychological symptoms" (*id.* at ECF 291).

## II.   The ALJ failed to Properly Evaluate Plaintiff's Subjective Statements in Finding Plaintiff's RFC

Plaintiff argues that the ALJ improperly declined to credit his testimony regarding the intensity, persistence, and limiting effects of his symptoms. (Pl. Br., Dkt. 14, at 32.) The Court agrees.

### A.   Subjective Evidence

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question . . . ." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citations omitted). The ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* (citation omitted).

"An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court, in large part because the ALJ had the opportunity to observe plaintiff's demeanor while the plaintiff was testifying." *Chiappa v. Comm'r of Soc. Sec.*, No. 18-CV-3508 (ER) (CM), 2019 WL 5722119, at *14 (S.D.N.Y. Aug. 16, 2019) (citations, quotations, and alterations omitted), *report and recommendation adopted*, No. 18-CV-3508 (ER) (CM), 2019 WL 4894360

(S.D.N.Y. Oct. 1, 2019).  "Thus, a district court will not 'second-guess' the ALJ's credibility finding 'where the ALJ identified specific record-based reasons for his ruling,'" *id.* (quoting *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order)), "and where his determination is supported by substantial evidence," *id.* (citing *Selian*, 708 F.3d at 420).

Still, "[a] finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (citation omitted).  "The failure to make credibility findings regarding the [claimant's] critical testimony [can] fatally undermine[] the [Commissioner's] argument that there is substantial evidence adequate to support his conclusion that [the] claimant is not under a disability."  *Id.* (citation omitted).  "Further, an ALJ's credibility determination— like an ALJ's evaluation of a treating physician opinion—cannot be based on unsupported interpretations of raw medical evidence or mischaracterizations of the record."  *Chiappa*, 2019 WL 5722119, at *15 (citation omitted).

### B.    The ALJ Failed to Adequately Consider the Subjective Evidence

As noted, the ALJ discounted Plaintiff's testimony on the grounds that

[Plaintiff's] statements about the intensity, persistence, and limiting effects of his symptoms . . . are inconsistent based on his inconsistent reports, activities of daily living, and overall medical evidence, which do not support the level of severity alleged. [Plaintiff] testified that he regularly plays video games from five (5) to eight (8) hours a day, which requires a high level of attention and concentration, as well as sitting or alternate sitting/standing. He also testified that he went to Dallas, Texas for a week in 2016 to meet other [video game players] whom he met online, suggesting a mild limitation in social interacting from the ability to meet people on the internet; and treatment records show that he reported having a good time in Dallas with his friend. He further testified that he occasionally lifts and carries his 19-pound daughter for approximately 10 minutes; and reported to the consultative examiner activities of daily living, including grooming himself regularly, shopping at nearby stores, managing his own finances, and, although not preferred, that he has the ability to go out alone. He further reported that on good days he is able to play with his children, play videogames, read books and watch t.v.

(Tr., Dkt. 10, at 16–17 (citations omitted).)

As noted, however, "it is well-settled law in this Circuit that such activity does not, in itself, contradict a claim of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Iorio*, 2020 WL 1536406, at *7 (citations and quotations omitted).  Further, Plaintiff's activities are consistent with the severity and persistence he ascribes to his symptoms.  For example, although he testified that he plays video games for "five hours" or "eight hours" *some days*, he clarified that he "normally [can sit for only] ten minutes or so" (*id.* at ECF 43), takes breaks when necessary (*id.* at ECF 45), and that "five to eight hours" would be "a long day" (*id.*).  Plaintiff's ability to walk an average of "two to five blocks" in Brooklyn, New York (*id.* at 43), hold his 19-pound daughter for "five to ten minutes" while sitting (*id.*), and stand for "about ten minutes" before "seesawing" (*id.* at 44), is also consistent with the inability to sit for six hours a day, *every day*, performing sedentary work.

Finally, the ALJ seemingly ignored crucial context in assessing Plaintiff's subjective reports.  For example, the ALJ's note that, "*on good days*" Plaintiff "is able to play with his children, play videogames, read books and watch t.v." (*id.* at 17 (emphasis added)) omits the previous sentence of the report, which notes that "some days he will only lay [sic] in bed" (*id.* at 270).  *See Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004) ("It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim." (citing *Lopez v. Sec'y of Dept. of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984), *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975), and *Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968))).  That Plaintiff admitted to *sometimes* functioning at a level compatible with sedentary work thus is consistent with his testimony that he cannot function at that level *regularly*.  In that respect, the "ALJ's credibility determination" was "based on . . . mischaracterizations of the record." *Chiappa*, 2019 WL 5722119, at *15 (citation omitted)

24

(finding that an ALJ erred in discounting the claimant's credibility with respect to her symptoms and limitations based in part on the claimant's ability to graduate college and work). Thus, on remand, the ALJ must take into account all relevant testimony and other evidence in assessing Plaintiff's credibility with respect to his subjective reports and explain what weight, if any, the ALJ decides to give those reports and why.

## CONCLUSION

For these reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 2, 2021
           Brooklyn, New York

25